McGREGOR W. SCOTT
United States Attorney
R. STEVEN LAPHAM
ELLEN V. ENDRIZZI
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2716

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 2:06-cr-00035 MCE |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S RESPONSE TO** |
| | ) | **DEFENDANT'S SENTENCING** |
| v. | ) | **MEMORANDUM** |
| | ) | |
| ERIC McDAVID, | ) | Date:  May 8, 2008 |
| | ) | Time:  9:00 a.m. |
| Defendant. | ) | Hon. Morrison C. England, Jr. |
| _____ | ) | |

I.    <u>INTRODUCTION</u>

Defendant Eric McDavid is set for judgment and sentencing before this Court on Thursday, May 8, 2008, at 9:00 a.m. The purpose of this memorandum is to set forth the government's recommendation and to address issues raised in the defendant's senetncing memorandum.

II.   **RECOMMENDATION**

The United States recommends that the Court sentence the defendant to a term of imprisonment of 240 months.  Although not set forth in the Presentence Report, the advisory Sentencing Guideline range, but for the statutory maximum, would be 235-293 months (33/VI).  Therefore, a sentence of 240 months is at the low end of the applicable guidelines and, in the government's

view is sufficient, but no greater than necessary, to address the
seriousness of this particular crime, the defendant's history and
character, and to comply with the purposes of subsection (a)(2)
of Title 18, United States Code, Section 3553.

Twenty years' incarceration is a long time.  The United
States understands this, and does not make its recommendation
lightly.  The severity of a 20-year sentence accords with the
defendant's intent and actions, and it strikes a balance among
the goals of the federal government's judicial, legislative, and
executive branches.  While Eric McDavid's sentence represents
punishment for his crime, his sentence also represents the need
to protect the public from those who would inflict grievous harm
and the need to deter those who would engage in similar crimes.

The defense asks for a sentence of 5 years' incarceration.
The probation officer recommends a sentence of 13 years'
incarceration.  As addressed below, both are insufficient and do
not reflect the seriousness of the defendant's crime.  Although
the need for non-disparate sentences is important, the reasoning
underlying the recommendations is thin and does not support a
lenient sentence.

### III. THE CALCULATED ADVISORY SENTENCING GUIDELINE RANGE IS CORRECT AND A SENTENCE AT THE LOW END OF THAT RANGE SUFFICIENTLY REPRESENTS PUBLIC INTERESTS

The probation officer correctly calculated the defendant's
advisory Sentencing Guideline range.  Further, the application of
the terrorism enhancement is appropriate and warranted in this
situation, and the statutory maximum provides a suitable cap on
the period of incarceration.  The defendant asks this Court to
ignore the Sentencing Guidelines – essentially casting aside the

research, policy review, and careful consideration of the many penal, civic, and judicial issues that form the foundation of the United States Sentencing Commission's Guideline Manual.[1]  The Guidelines provide a solid foundation for sentencing, and coupled with an analysis of the defendant's individual situation, the advisory range provides a consistent recommendation that addresses the relevant public and private interests regarding the defendant's incarceration.  A sentence of 20 years' imprisonment, the low end of the advisory Guidelines Range, is both necessary and sufficient.

### A.    The Guideline Calculation Is Correct

Paragraphs 30 through 40 of the Presentence Report (PSR) set forth the probation officer's calculation of the defendant's total offense level and his criminal history category.  PSR at 9-11.  The probation officer determined that the defendant's total offense level is 33 and his criminal history is VI.

In a letter dated February 12, 2008, McDavid objected to the base offense level of 24 and the imposition of the 12-level terrorism enhancement as set forth in the PSR, but the probation officer declined to make changes, setting forth her rationale in a letter dated February 21, 2008.  McDavid makes the same objections in his sentencing memorandum (at 14-17), and improperly submits juror declarations and ignores the evidence

---

[1]  The defendant's cursory commentary regarding "the law of federal sentencing since 1999," in which he pulls quotations from a variety of cases without analysis, does not create an issue for exploration.  The Court is aware of what should and should not be considered at sentencing, and the United States submits its recommendation having considered carefully the advisory Sentencing Guidelines and the § 3553 factors.

from trial proving that the defendant did conspire to damage or destroy government property as set forth in the indictment.  The base offense level of 24 is correct, and the 3-level reduction as a specific offense characteristic for conspiracy appears appropriate.

Additionally, the probation officer recommends a 12-level upward adjustment to the base offense level pursuant to U.S.S.G. § 3A1.4, which addresses felonies that involve or intend to promote a federal crime of terrorism.  The Guidelines Manual defines a "federal crime of terrorism" as 1) an "offense that is calculated to influence or affect the conduct of the government by intimidation or coercion or to retaliate against government conduct," and 2) that violates certain identified Code sections, including 18 U.S.C. § 844(f).  See U.S.S.G. § 3A1.4 cmt. n.1 (stating that "for purposes of this guideline, 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)").  The terrorism enhancement also requires that the criminal history category be increased to VI if the defendant's scored criminal history is less than a category VI.  See U.S.S.G. § 3A1.4(b).  As discussed in more detail below, and as the probation officer noted in her response, the evidence in this case clearly demonstrates that the enhancement applies.

Thus, the probation officer's determination of the total offense level and criminal history category is correct.  The advisory Guideline range, but for the 240-month statutory maximum, is 235-293 months (19.58 – 24.42 years).

////

////

4

1     **B.    A 20-Year Sentence Addresses the Public Interests as Set Forth by Congress and Adequately Ensures That the Defendant's Severe Crime Is Punished in Kind**

McDavid clearly sought to intimidate public officials and retaliate against the government's conduct.  Trial testimony and recorded evidence demonstrate this.  The goals of terrorism are fear and destruction.  McDavid sought to strike out against the government, and his plans, especially arson at the Institute of Forest Genetics (IFG), would have caused chaos and widespread damage.  One only needs to visit the IFG to see that any sort of incendiary device would burn not only the government facility, but could easily rage beyond the control of firefighters and cause damage to the surrounding forest and private property as well.  If the Court will recall, the witness from the IFG testified that if one of the chemical sheds on the property, which, from the map McDavid drew, he plainly saw, had caught fire, the responding firefighters may not have been able to respond, but, instead, would have had to let the entire area burn, because of the toxic smoke that would be released.

The statutory maximum term of imprisonment under 18 U.S.C. § 844(f) and the terrorism enhancement under U.S.S.G. § 3A1.4 combine to create a reasonable sentence of 20 years.  Congress has legislated the 20-year maximum term for arson, reflecting society's position regarding punishment for such a crime that does not result in personal injury.  See 18 U.S.C. § 844(f)(2) (mandating a sentence of no less than 7, but no more than 40, years' imprisonment if the conduct "directly or proximately causes personal injury or creates a substantial risk of injury to any person"); 18 U.S.C. § 844(f)(3) (mandating that if such

conduct directly or proximately causes the death of any person,
the defendant "shall be subject to the death penalty, or
imprisoned for not less than 20 years or for life").  As the
statute indicates, had McDavid caused the death of any of the
scientists that he knew lived on the IFG property, he would be
facing the death penalty.  18 U.S.C. § 844(f)(3).

Similarly, the terrorism enhancement promulgated by the
Sentencing Commission pursuant to the United States Code creates
a reasonable advisory baseline sentence for those who would
conspire to or inflict grievous harm on the persons of the United
States for the purpose of terrorizing the public and the
government.  See U.S. Sentencing Guideline Manual, App. C, vol.
I, amend. 526 at 449-50 (creating enhancement for terrorism and
deleting upward departure provision for terrorism, § 5K2.15)
(subsequently amended in 1996, 1997, and 2002).  Under § 3A1.4, a
defendant who meets the very narrow criteria for terrorism faces
a minimum advisory sentence of 210 months, representing an
offense level of 32 and criminal history category of VI.  See
U.S.S.G. Ch. 5, pt. A, Sentencing Table.  Here, in McDavid's
case, the base offense level is higher because the underlying
charge is more significant.

McDavid's home-grown brand of eco-terrorism is just as
dangerous and insidious as international terrorism.  A 20-year
term of imprisonment demonstrates that the public does not
tolerate those who would generate fear and inflict massive
property damage in order to oppose government policy.  The fact
that McDavid did not ultimately commit arson is irrelevant,
because the Sentencing Guidelines took into account the

conspiracy and a downward 3-level offense adjustment was applied. (See PSR at ¶ 32).  Had there not been an informant within the group, it is highly likely that McDavid would have damaged some property, possibly the IFG, especially when the conspirators discussed the testing and use of alternative incendiary devices such as a container combining gasoline and diesel fuel.  The capped term of imprisonment under the statute is a check against the factors determining sentencing under the advisory Guidelines. A sentence of 20 years' incarceration is the point where the two meet.  Such a sentence is reasonable and reflects the will of the people as implemented through legislation, and reflects the experience of the judiciary and the goal of consistent sentencing through the promulgation of the Sentencing Guidelines.

**IV.    DEFENDANT'S PROFFERED REASONS FOR A LOWER SENTENCE**

**A.    Alleged Sentencing Disparity**

**1.    Alleged Disparity With Sentences of Co-Defendants**

In return for their cooperation and testimony at trial, the co-defendants in this case were each permitted to plead guilty to an offense that contains a maximum penalty of five years imprisonment.  The Court has had an opportunity to see these defendants firsthand and can perhaps understand the reason the government extended these offers.  Both defendant are very young, both in terms of their chronological age as well as maturity.  At the time of the events for which they are convicted Zach Jenson was 20; Lauren Weiner 19.  Upon indictment, both immediately recognized the seriousness - and foolishness - of their conduct, and made the decision to plead guilty and cooperate.  In contrast, McDavid was significantly older than the others - 28 at

the time of the charged events.  He was also the person who
recruited Jenson and Weiner, the person who first raised the
subject of the use of explosives, and the person who, among all
the members of the group, expressed no reservation about the
possibility that someone might be accidentally killed as a result
of their actions.

McDavid was offered multiple chances to accept a plea
agreement which would have given him a chance to argue for a
lower sentence than he now faces.  That, however, would have
branded him a traitor to the eco-terrorist movement, a fate he is
apparently unwilling to endure.[2]  Nor has the defendant ever
renounced his ties to the eco-terrorist movement in general or
his conduct in this case in particular.  His opportunity to do so
was when the Probation Officer sought to interview him but he
declined to be interviewed on advice of counsel.

It is, of course, McDavid's choice if he wishes to be a
martyr to the cause, but he should face the consequences of his
choices.

### 2.   Ryan Lewis case

McDavid attempts to compare himself to Ryan Lewis, who
received an 6-year sentence for committing or attempting to
commit three ELF-inspired arsons. (Def. Sent. Mem. at 8).  There
are at least two significant differences between the McDavid and

---

[2]  As a result of their pleas, both Jenson and Weiner were
branded as snitches and traitors to the radical environmental
movement, and their photos and plea agreements have been posted
on the Internet.  See http://portland.indymedia.org/en/2006/07/
342853.shtml (Jenson) and http://portland.indymedia.org/en/2006/
07/340220.shtml (Weiner); http://forums.scootaround.com/tool/post
/whosarat/show_single_post?pid=23259194&postcount=217 (a message
board posting at www.whosarat.com about the case.

1  Lewis cases.  First, Ryan Lewis pled guilty and received a three-
2  point reduction for acceptance of responsibility.

3      Second, although the government believes that Lewis richly
4  deserved the terrorism enhancement, he did not meet the technical
5  requirements under U.S.S.G. § 3A1.4 for that enhancement to
6  apply.  As discussed above, that definition requires that the
7  conduct in question must be "calculated to influence or affect
8  the conduct of government by intimidation or coercion or to
9  retaliate against government conduct."  See 18 U.S.C. §
10 2332b(g)(5); U.S.S.G. § 3A1.4, cmt. n.1.  Lewis did not meet that
11 definition because his crimes were directed at private property –
12 a home under construction, a medical office building, and an
13 apartment complex – as a protest against private development.  In
14 contrast, McDavid's conduct was directed at government
15 facilities, including the Institute of Forest Genetics and the
16 Nimbus Dam and Fish Hatchery, as a protest against governmental
17 action, specifically, the genetic modification of trees and the
18 damming of waterways and control of the salmon migration.
19 McDavid made it clear that he opposed government "intrusion" and
20 proposed and supported the targeted federal sites accordingly.

21         **3.  Oregon Defendants**

22     McDavid also compares himself to three Oregon defendants –
23 Nathan Block, Daniel McGowan, and Jonathan Paul – who were
24 respectively sentenced to 92, 84, and 48 months' imprisonment.
25 Like Ryan Lewis, however, these defendants also stand in a
26 significantly different relationship than McDavid.

27     First, McDavid's claim to the contrary notwithstanding (Def.
28 Sent. Mem. at 10-11), all three defendants pled guilty, were

debriefed, and received sentence reductions based on cooperation.
Although Block and McGowan received the terrorism enhancement,
Paul was not eligible for that enhancement, which explains his
lower sentence.

Second, as defendant's sentencing memo indicates, the Oregon
indictment charged offenses that were, at the time of indictment,
between 5 and 10 years old and were highly dependent on the
testimony of co-conspirators describing the roles of the
defendants.  Under such circumstances, it would not be surprising
if the prosecution discounted the case to some extent based on
the perceived quality of the evidence.  Here, in contrast, the
government's evidence left little doubt as to the defendant's
involvement in the conspiracy.

**4.    A More Appropriate Comparison: U.S. v. Patterson**

Generally, the government does not believe that it is a
fruitful exercise to attempt to compare sentences between cases.
A multiplicity of factors may account for an apparent disparity
in sentences, such as the quality of the government's evidence,
whether the defendant's testimony was critical to securing the
conviction of others, as well as aggravating or mitigating
factors peculiar to a particular defendant.

Nevertheless, if the Court is looking for a closer
comparison from the Eastern District, it might try United States
v. Patterson, CR. S-99-551 EJG.  That was a 2002 conviction
following a jury trial for conspiracy to blow up two large
propane storage tanks near Elk Grove.  The defendants were part
of the so-called "militia movement" and undertook their actions
as a protest against policies of the federal government with

which they disagreed.

As in this case, the government had a cooperating witness who provided tape recordings of the conspirators discussing their plans.  As in this case, nothing was ever blown up.  In fact, although the defendants had procured the components necessary to create an improvised explosive device, they were never permitted to get anywhere close to actually constructing a bomb. Nevertheless, upon conviction, both defendants received the terrorism enhancement.  Defendant Kevin Ray Patterson received a sentence of 293 months' imprisonment and Defendant Charles Kiles received a sentence of 264 months' imprisonment.

**5.    Other Cases applying the Terrorism Enhancment**

Other reported cases demonstrate that defendants across the nation have received substantial sentences for terrorism-based offenses, including arson and solicitation of murder.

For instance, in <u>United States v. Hale</u>, 448 F.3d 971 (7th Cir. 2006), the defendant, the founder of the hate-mongering World Church of the Creator, was sentenced to a total of 480 months imprisonment for soliciting the murder of a federal district judge and obstructing justice.  <u>Id.</u> at 982.  That sentence, imposed post-<u>Booker</u>, equaled the statutory maximum penalty of 20 years for the solicitation count, and 10 years for each obstruction of justice count.  <u>Id.</u>  The defendant - who had no prior criminal record – was a law school graduate and the son of a retired police officer.  <u>Id.</u> at 989.  Nevertheless, his total offense level, was 45, and his criminal history category was VI, following the affirmed imposition of the terrorism enhancement.  <u>Id</u>. at 982.  The defendant was not successful in

11

1  procuring the murder of Judge Lefkow, just as McDavid did not

2  burn down the IFG, yet a substantial sentence was warranted, as

3  it is here, in order to address the severity of the crime and

4  deter others from similar criminal conduct.

5        Additionally, in <u>United States v. Dowell</u>, 430 F.3d 1100

6  (10th Cir. 2005), the defendant was convicted at trial of

7  destroying government property, an IRS office, by fire or

8  explosive, in violation of 18 U.S.C. §§ 841(f)(1), (2), in

9  addition to other charges. <u>Id</u>. at 1104. The circuit court

10 affirmed the use of the terrorism enhancement and held that no

11 Sixth Amendment violation had occurred. <u>Id</u>. at 1110. In <u>Dowell</u>,

12 the district court determined that the defendant's applicable

13 Guideline range was 324-405 months, and sentenced the 57-year old

14 defendant to a 360-month term of incarceration – essentially a

15 life sentence.[3] The circuit court went on to determine that the

16 <u>Booker</u> error that occurred was harmless, because the district

17 court, in sentencing the defendant to the middle of the range,

18 demonstrated that it knew it had the discretion to impose a

19 lesser sentence. <u>Id</u>. at 1112. Further, the district court also

20 addressed the section 3553(a) factors when imposing sentence.

21 <u>Id</u>. at 1112 n.11.

22       Finally, in <u>United States v. Harris</u>, 434 F.3d 767 (5th Cir.

23 2005), the circuit court held that the district court correctly

24 applied the terrorism enhancement and that it did not commit

25 plain error by imposing the Guideline sentence under the pre-

26 <u>Booker</u> regime. <u>Id</u>. at 773-74. The defendant in <u>Harris</u> pled

27

28     [3] The crime of 18 U.S.C. § 844(f)(2) carries a statutory 40-year maximum term of imprisonment.

guilty to maliciously damaging and destroying a municipal building by means of fire and explosive, a violation of 18 U.S.C. § 844(*i*), and furthering that crime of violence with a destructive device, a violation of 18 U.S.C. § 924(c)(1). He was sentenced to 240 months' incarceration on the arson count, followed consecutively by 120 months' imprisonment on the destructive device count. <u>Id</u>. at 770.

While the two arson cases involved the actual destruction of property by fire and explosive, the courts appeared to take that into account by stacking the sentences consecutively and imposing sentences above the lowest Guideline range.

**B.    <u>Defendant's Alleged Medical Condition</u>**

In April 2007, a physician at the Sacramento County Jail diagnosed McDavid as suffering from pericarditis. Pericarditis is a swelling and irritation of the sack around the heart, the cause of which is generally unknown but thought to be a viral infection. <u>See</u> http://www.webmd.com/heart-disease/tc/pericarditis-topic-overview. Pericarditis usually does not cause serious problems. Most people improve within 7 to 10 days. <u>Id</u>. If there are no other problems, pericarditis usually goes away on its own, but a doctor may suggest non-prescription pain relievers to help with the pain or discomfort and, in some cases, may prescribe stronger medicine. <u>Id</u>. Because pericarditis can sometimes be caused by a more serious problem, like a heart attack, it is important to be evaluated by a doctor. Early treatment can also prevent pericarditis from leading to other problems. <u>Id</u>.

////

When the defendant developed his problem in April 2007, defense counsel, quite prudently, sought additional medical treatment for his client and filed a declaration with the Court from a cardiologist laying out the dire consequences if the condition were to develop into something worse.  Declaration of Dr. Raye Bellenger filed 4/15/07.  Like the voiceover at the end of a prescription drug commercial, these are posible, but not common, consequences.  McDavid, however, now repeats the substance of those statements in his sentencing memorandum as if they are a likely scenario.  (Def. Sent. Mem. at 11)

As far as the United States Attorneys Office can ascertain, the defendant has suffered no recurrence of that condition and no residual side effects.[4]  Nor does the Court have any evidence before it indicating this to be the case.  In any event, the Bureau of Prisons is equipped to handle medical issues of far greater severity than the defendant presents here.  Accordingly, this should not be a basis for a lower sentence.

**C.    <u>Character</u>**

The government typically does not comment about character references, but here an exception is warranted.  The letters all seem very heartfelt but they seem to be describing a person who no longer exists.  They describe a kind and gentle and caring young man who played football, attended college, assisted his sister at church camp and was helpful to friends and family. None of the letters address what Eric McDavid became.

---

[4]  The undersigned contacted the United States Marshal who, in turn, contacted the jail nurse. The United States Marshal was informed that there had been no recurrence of the defendant's pericarditis and no residual effects requiring treatment.

Apparently, sometime after he left home to travel the country he became increasingly more radical.  Perhaps this was a side of his personality that he did not want friends and family to see.[5]

What is undeniable is that McDavid became a follower of Derrick Jensen, the radical environmentalist whose interview McDavid passed out to his co-conspirators when they assembled at the McDavid family home in November, 2005.  Here is what Jensen said when he was asked how he feels about the Earth Liberation Front and the Animal Liberation Front:

> I have no criticism of the ELF or ALF.  That
> said, I would like to see further actions that
> move up the infrastructure, because they are
> doing what I would call endpoint sabotage. I see
> a difference between symbolic and non-symbolic
> actions; . . . When you burn four SUVs - and this
> is not pejorative at all, I want that explicit -
> that's a symbolic action, because four SUVs
> doesn't make that much difference. . . I've got
> that line: "every morning I wake up and ask
> myself whether I should write or blow up a dam.
> A few people have written to me and said: "that's
> not the best way to get your message out."  I
> always respond that if I were to take out a dam
> it would not be to send a message; if I want to
> send a message, I'm going to write a book. Taking
> out a dam would help a river liberate itself and
> to help the salmon.  That would be non-symbolic
> action.  We, in the environmental movement, are
> far too fond of symbolic action.
>
> . . . .
>
> When I say it's a government of occupation and a
> culture of occupation, I'm not speaking meta-
> phorically.  What did Russian partisans in WWII
> do? What did members of the Dutch underground do
> to try and undermine the Nazi Army?  Did they
> hold up banners? What did they do?  How did they
> do it?
>
> Why do I write?  I'm a recruiter for the revolu-
> tion.  I think all the ELF actions are great for

---

[5] One of the letter-writers, in fact, noted that "many of his old friends barely were aware of his political positions on any issues."  Letter of Dr. Christine Peterson.

1               that because you get "oh my god, somebody else
2               did this. It's a great idea."  It encourages
                other people to do it too.  This kind of stuff
3               happens all the time, we just don't hear about it
                very much.

4  Govt. Exh. 21 at 8-9.

5      This is the writing that, in November 2005, McDavid found so

6  compelling that he made Weiner, Jensen, and Anna read and then

7  discuss it. During the ensuing discussion McDavid referenced

8  Jensen's response to the argument that violent acts will alienate

9  the "fence-sitters" by saying that the "fence-sitters" will

10  probably not be won over anyway. Clearly, if there was a time

11  when McDavid was gentle and favored non-violence, he had grown

12  out of it.

13      What is also undeniable is that McDavid was the one who

14  first advocated using explosives when he recruited Weiner and

15  Jensen in August, 2005; that he did so because, as he told

16  Weiner, he no longer believed that non-violent protest was

17  working; that he told the others that what they were doing was a

18  crime; that his preferred target was the Institute of Forest

19  Genetics, the so-called "tree factory"; that he knew that people

20  were living at that facility; and that he was indifferent to the

21  possibility that someone might be accidentally killed as a result

22  of that attack.

23      Clearly, the defendant became a different person than his

24  friends and family recall from his youth.  He began attending

25  Crimethinc meetings and anarchist gatherings.  And somewhere

26  along the line he became the type of person who could threaten to

27  kill a young woman if she turned out to be an informer and the

28  type of person who could express regret over not being involved

in the death of a police officer.  There is nothing before the
Court to suggest that the defendant has renounced these views and
would not continue to be a threat after he is released from
prison.

> **D.   Imperfect Entrapment**

The defendant argues that the Court should depart downward
because, although he was not entrapped as a matter of law, the
government nevertheless engaged in outrageous conduct which
constitutes "imperfect entrapment". (Def. Sent. Mem. at 17).  At
the conclusion of all the evidence, the Court opined that the
evidence that the defendant had been entrapped was "slight," but
nevertheless permitted the issue to go to the jury.  In its order
denying the defendant's post-trial motions, the Court rejected
the defendant's argument of outrageous government conduct stating
"the government attached itself to an ongoing plan, and created
an opportunity for the offense to be committed."  Order filed
3/28/08 at 20.

The government's position on this has been expressed in
previous court filings.  In light of the Court's rulings, the
government will not repeat those arguments here except to say
that they provide no basis for a downward departure.

> **E.   Sentencing Entrapment**

The defendant asserts that the evidence at trial established
that it was Anna who pushed the idea of attacking the Institute
of Forest Genetics.  (Def. Sent. Mem. at 18-19).  That is
incorrect.  The subject first came up during a car ride from
Bloomington to Chicago following the July, 2005 Crimethinc
convergence.  During that car ride McDavid confided to "Anna"

that during Winter 2005-06 he planned to target with explosives several facilities, including banks, mountaintop removal mining companies, and a United States Forest Service (USFS) genetic engineering facility in Placerville, California.  During the November meeting, when each member of the conspiracy was asked to pick a target, the defendant, without prompting, selected the "tree factory."  Later, in January, when Weiner showed evident confusion on why the IFG should be a target, it was McDavid who was able to give the rationale.

**V.   CONCLUSION**

For the reasons set forth above, the United States respectfully requests that Defendant be sentenced to a term of imprisonment of 240 months.

Dated:  May 6, 2008

                              Respectfully submitted,

                              McGREGOR W. SCOTT
                              United States Attorney

                              /s/ R. Steven Lapham
                         By:  /s/ Ellen V. Endrizzi

                              R. STEVEN LAPHAM
                              ELLEN V. ENDRIZZI
                              Assistant U.S. Attorneys